IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| CARLOS ACEVES GURROLA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No._____ |
| ) | |
| DANIEL ALVAREZ, ) | Jury Trial Demanded |
| ANTONIO TREJO, ) | |
| EL TORRERO, INC. ) | |
| DANIEL & ANTONIO, INC. ) | |
| D.A.J., INC. ) | |
| EQUIPMENT & AUTO MART LLC ) | |
| A & A MANAGEMENT COMPANY, LLC ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff Aceves Gurrola for his complaint against Daniel Alvarez, Antonio Trejo, El Torrero, Inc., Daniel & Antonio, Inc., D.A.J., Inc., Equipment & Auto Mart LLC, and A & A Management Company LLC states and alleges as follows:

### NATURE OF ACTION

1. Defendants Daniel Alvarez and Antonio Trejo own several companies and businesses in the Cape Girardeau, Missouri area. Defendants Alvarez and Trejo held Plaintiff Carlos Aceves Gurrola in forced labor and debt peonage to financially benefit themselves and their companies, which also are Defendants in this matter.

2. Defendants required Plaintiff Aceves Gurrola to work in a warehouse, at their restaurants, and to perform various other jobs from 2009-2014. During those years Defendants

paid Mr. Aceves Gurrola only a small weekly stipend in cash. Defendants were aware that Mr. Aceves Gurrola, along with other workers at their businesses, were undocumented immigrants. Defendants forced Mr. Aceves Gurrola to work in harsh environmental conditions for 90 or more hours a week.

3. Defendants paid Mr. Aceves Gurrola so little that he could not buy food for his family. Defendants forced Mr. Aceves Gurrola into a debtor relationship in which he was allowed to take food from the Defendants' warehouse but be charged and required to pay the sum back over time. When Mr. Aceves Gurrola told Defendants that he needed to find a better paying job, Defendants induced him into borrowing $10,000 in exchange for the promise of obtaining legal immigration status. No work was done in exchange, and Mr. Aceves Gurrola became even more deeply indebted to Defendants.

4. Defendants also threatened Mr. Aceves Gurrola physically and through abuse of the legal process. When Mr. Aceves Gurrola again stated that he needed to find a better job, he was threatened with a gun and with the promise that immigration officials would be alerted to his location and illegal status if he attempted to leave.

5. Ultimately, Mr. Aceves Gurrola fled Missouri to escape from Defendants, but the emotional trauma he suffered remains. Mr. Aceves Gurrola seeks to recover the economic and noneconomic damages he suffered by Defendants' violations of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589, *et seq*.

## JURISDICTION AND VENUE

6. This Court has federal question jurisdiction as this action arises under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589 *et. seq*. The

Court also may exercise diversity jurisdiction as Plaintiff and Defendants reside in different states.

7. The Court may exercise personal jurisdiction over Defendants as they reside in the State of Missouri.

## PARTIES

8. Defendant Daniel Alvarez is an adult male residing in Cape Girardeau, Missouri.

9. Defendant Antonio Trejo is an adult male residing in Jackson, Missouri.

10. Defendant El Torero, Inc. is a corporation incorporated under the laws of Missouri. Its principal office is located in Cape Girardeau, Missouri, and it is registered to do business in Missouri. Defendant Alvarez is the Registered Agent, President, Secretary, and Director.

11. Defendant Daniel & Antonio, Inc. is a corporation incorporated under the laws of Missouri. Its principal office is located in Jackson, Misouri, and it is registered to do business in Missouri. Defendant Alvarez is the Registered Agent, President, Secretary, and Director. Defendant Trejo is Vice President and Director.

12. Defendant D.A.J., Inc. is a corporation incorporated under the laws of Missouri. Its principal office is located in Cape Girardeau, Missouri, and it is registered to do business in Missouri. Defendant Alvarez is Registered Agent, President, and Director. Defendant Trejo is Vice President.

13. Defendant Equipment & Auto Mart LLC is a Limited Liability Company organized under the laws of Missouri. It was registered to do business in Missouri, and can be served through its registered agent, Defendant Alvarez.

14. Defendant A & A Management Company LLC is a Limited Liability Company organized under the laws of Missouri. It was registered to do business in Missouri, and can be served through its registered agent, Defendant Alvarez.

15. Defendants Alvarez and Trejo own multiple Mexican restaurants and a warehouse providing supplies to restaurants in and around Cape Girardeau and Jackson, Missouri.

16. Plaintiff Carlos Aceves Gurrola is an adult male who came, with his family, to Missouri in 2009 to work for Defendants Alvarez and Trejo in their warehouse and restaurants and provided other labor and services.

## FACTUAL BACKGROUND

**Recruitment of Plaintiff Aceves Gurrola**

17. In 2009, Defendants Alvarez and Trejo owned multiple Mexican restaurants in the Cape Girardeau area. Defendants Alvarez and Trejo decided to open a warehouse to sell food and supplies to local restaurants.

18. Plaintiff Aceves Gurrola learned through a family member about Defendants Alvarez and Trejo's business operations and their need for workers. Plaintiff Aceves Gurrola sent a copy of his resume to apply for open positions.

19. Defendant Alvarez invited Plaintiff Aceves Gurrola to come work or apply for work at his businesses.

20. Plaintiff Aceves Gurrola and his family traveled to the United States from Mexico with the understanding that Alvarez would provide him with work and pay sufficiently for Aceves Gurrola to support his family's basic needs.

21. On or about December 3, 2009, Defendant Alvarez met with and briefly interviewed Plaintiff Aceves Gurrola.

22. At that meeting, Defendant Alvarez was aware that Plaintiff Aceves Gurrola was Hispanic and spoke little to no English.

23. On information and belief, Defendant Alvarez was also aware that Defendant Alvarez had sold most of his family's possessions in Mexico and used the proceeds to travel to the United States, leaving him unable to purchase transportation back to Mexico.

24. Defendant Alvarez did not request immigration or citizenship paperwork and was aware that Plaintiff Aceves Gurrola was an undocumented worker.

25. At the meeting on December 3, 2009, Defendant Alvarez offered Aceves Gurrola a job in the warehouse he had recently opened.

**Working Conditions and Debt Peonage**

26. Defendants Alvarez and Trejo's warehouse provided food to their restaurants, as well as numerous other restaurants in the area.

27. During the winter, the warehouse was not heated and was extremely cold. Plaintiff Aceves Gurrola could see his breath and his fingers would become extremely numb and even fall asleep from the cold. He and other workers would take turns getting inside a cooler at the warehouse because the cooler was warmer than the warehouse.

28. Plaintiff Aceves Gurrola worked for Defendants from 2009 to mid-2014. During that time, Plaintiff Aceves Gurrola worked Monday thru Saturday from 7:00 am until 10:00 pm. His days began in the warehouse, but when he finished his work there, Defendants expected Aceves Gurrola to go to one of his restaurants to bus tables or do other tasks. Aceves Gurrola regularly worked 90 hours per week.

29. Defendants gave Plaintiff Aceves Gurrola a cell phone and then used the phone to track and monitor his movements.

30. No matter how many hours Plaintiff Aceves Gurrola worked, Defendants only paid him $400 in cash per week. His hourly wage was approximately $4.40 per hour.

31. Defendant Alvarez primarily supervised Plaintiff Aceves Gurrola. In addition, Defendant Trejo also came to the warehouse multiple times a week to supervise Aceves Gurrola and other employees.

32. On information and belief, many of the other people working for Defendants Alvarez and Trejo were undocumented.

33. Defendants Alvarez and Trejo coordinated together to pay the workers. They put cash into individual envelopes every week to pay undocumented workers, including Plaintiff Aceves Gurrola.

34. Because Defendants were paying Plaintiff Aceves Gurrola only $400 per week, regardless of the number of hours worked, he had extreme difficulty providing food for his family.

35. Defendant Trejo, who was Alvarez's business partner, was aware or should have been aware that Plaintiff Aceves Gurrola was being severely underpaid and forced to work due to Alvarez's threats and intimidation tactics.

36. Plaintiff Aceves Gurrola asked Defendant Alvarez for a raise. Defendant Alvarez refused to increase his pay.

37. Instead, Defendant Alvarez told Plaintiff Aceves Gurrola to take food from the warehouse on credit.

38. With no other options available, Plaintiff Aceves Gurrola began to feed his family with food from Defendants' warehouse. As a result, Aceves Gurrola became increasingly indebted to Defendants.

39. One day, after a few months of Plaintiff Aceves Gurrola feeding his family with groceries on credit, Defendant Alvarez took him outside the warehouse and berated him for his work and gave him additional assignments.

40. Defendant Alvarez told another employee, Miguel, to collect the grocery debt from Plaintiff Aceves Gurrola. Aceves Gurrola continued to pay $10.00 or $20.00 at a time toward the grocery debt but could not pay back the sum because he had to continue taking additional groceries on credit.

41. Defendant Alvarez told Plaintiff Aceves Gurrola that he was taking too much food from the warehouse on credit and became angry, highlighting the control Defendant exercised over Plaintiff's access to food.

42. In addition to working at the warehouse, Defendant Alvarez had Plaintiff Aceves Gurrola fix his restaurants' computers. Alvarez would either have someone drop the computers off at the warehouse or would send Aceves Gurrola to a specific restaurant. While working on these computers, Aceves Gurrola saw that all the restaurants had cameras to monitor workers at all times.

43. Once, Defendant Alvarez sent Plaintiff Aceves Gurrola to fix a computer at a restaurant in Jackson, Missouri. Aceves Gurrola saw the manager delete some of the electronic receipts from the business. On a separate form, the manager kept a record of the totals for the day with and without the deleted receipts.

44. Plaintiff Aceves Gurrola asked Miguel, his fellow employee, why the manager deleted receipts. Miguel told Aceves Gurrola to be careful what he said because Defendant Alvarez was not someone to make angry. According to Miguel, Alvarez had murdered someone in Mexico, but the authorities did nothing to stop or punish him. Miguel also told Aceves Gurrola

that Alvarez was usually armed with a gun. Aceves Gurrola worried that Miguel would tell Alvarez he was asking questions about the restaurants' record keeping, which would upset Alvarez.

**Immigration Documentation Scheme to Create Additional Debt Peonage**

45. In approximately February 2011, Plaintiff Aceves Gurrola notified Defendant Alvarez that he was looking for other work to support his family. Alvarez told Aceves Gurrola not to quit, spoke loudly, and seemed agitated by this.

46. Defendant Alvarez told Plaintiff Aceves Gurrola that he knew a person who could get Aceves Gurrola and his family legal status in the United States if Aceves Gurrola continued to work for him. Alvarez told Aceves Gurrola it would cost $10,000, but that he was willing to loan the money to Aceves.

47. Defendant Alvarez connected Aceves Gurrola with a woman named Mayra Romero, whom Alvarez said lived in California and had assisted several of Alvarez's family members obtain status in the United States.

48. Mayra Romero told Plaintiff Aceves Gurrola to mail her copies of passports and birth certificates for him and his family. In June 2011, Aceves Gurrola mailed these documents to Romero at a residential address in Corona, California.

49. Shortly afterwards, Romero asked Aceves Gurrola for his current address. Romero represented that she would be providing the information to immigration officials and that Aceves Gurrola would receive a notice to interview. She provided him with her Hotmail email address, and Aceves Gurrola emailed his address to Romero on June 23, 2011.

50. In June 2011, Romero told Plaintiff Aceves Gurrola that his immigration paperwork was ready and that he needed to send her the $10,000.

51. Plaintiff Aceves Gurrola told Defendant Alvarez about Romero's request for payment. Alvarez told Aceves Gurrola to come to his home the next day to pick up the money.

52. When Aceves Gurrola arrived the next day, Alvarez's wife gave Aceves Gurrola $10,000 in cash. She also gave Aceves Gurrola the bank account information where he was supposed to deposit the funds.

53. Defendant Alvarez's wife directed Aceves Gurrola to deposit $5,000 into an account for Romero, and $5,000 into an account for a woman named Estela Lopez in St. Hemet, California.

54. Plaintiff Aceves Gurrola took the cash to the bank and deposited it into the accounts Alvarez's wife had provided. Aceves Gurrola called Romero, who confirmed she had received the money.

55. Defendant Alvarez told Aceves Gurrola to trust Romero because she had obtained immigration papers for his own family members. As a result, Aceves Gurrola felt motivated to keep working hard for Alvarez for another year.

56. In April 2012, Romero told Aceves Gurrola to have his fingerprints taken at a Missouri Applicant Processing Services public office, rather than a location for the United States Citizenship and Immigration Services. Plaintiff Aceves Gurrola was not aware that being fingerprinted at a Missouri state office, rather than USCIS, would provide no benefit to obtaining immigration status.

57. After a few months without news from Romero, Plaintiff Aceves Gurrola called her. Romero said everything was going well and she would call him when something new happened. She was short with Aceves Gurrola and got him off the phone quickly.

58.     And then after several more months, Aceves Gurrola called Romero to check on the status of his case again. She did not answer any of his calls or messages.

59.     When Aceves Gurrola told Alvarez that Romero was not returning his calls, Alvarez once again told him to trust Romero.

60.     Ultimately, Romero's phone number was disconnected and she still had not returned Plaintiff Aceves Gurrola's calls.

61.     Aceves Gurrola asked Alvarez to get in touch with Romero.

62.     Alvarez said he would contact her, but when Aceves Gurrola asked him later what was happening, Alvarez said she was not answering his calls and then quickly changed the subject.

63.     On October 17, 2012, Aceves Gurrola emailed Romero asking her to answer his email or refund the money he had paid her. She did not respond.

64.     Plaintiff Aceves Gurrola suspected that Alvarez had tricked him and that Romero was not working to get him immigration status. Instead, Alvarez had made the representations to keep Aceves Gurrola in debt peonage and working at his businesses.

65.     On information and belief, based upon his later-assigned identification from USCIS, Romero never submitted any immigration documentation on his behalf.

**Threats and Increasing Debt Peonage**

66.     Plaintiff Aceves Gurrola concluded that he needed to find a better paying job. Unfortunately, Alvarez was in Mexico and could not be reached. Aceves Gurrola was afraid to leave his employment without notifying Alvarez because he worried Alvarez would become upset and attack him with the guns Alvarez owned.

67. In early 2013, Alvarez returned from Mexico. Aceves Gurrola contacted Alvarez and said he had something important to discuss with Alvarez. Alvarez said he would meet Aceves Gurrola at the warehouse later that day.

68. When Defendant Alvarez arrived at the warehouse, Aceves Gurrola went outside to meet him at his truck. As Alvarez got out of the truck, Aceves Gurrola saw Alvarez was on crutches and had a pistol in a belt at his waistband.

69. Alvarez told Aceves Gurrola that people in Mexico had tried to kidnap him, but that his connections in the Zetas cartel helped him by escorting him and his wife to the Mexico-United States border.

70. Aceves Gurrola knew that the Zetas are an extremely violent and dangerous cartel. If the Zetas provided Alvarez with an escort, it was because he was important and powerful. Aceves Gurrola knew that in Mexico, a person can get away with severe crimes if they have cartel connections and money to bribe officials.

71. These facts intimidated and scared Aceves Gurrola because he knew Alvarez and his cartel connections could hurt Aceves Gurrola and his family. This also reinforced what Alvarez's employee, Miguel, had told Aceves Gurrola about how Alvarez got away with murder in Mexico.

72. Defendant Alvarez and Aceves Gurrola went inside the warehouse and sat down at a desk. As Alvarez sat down, he put his pistol on top of the desk.

73. Plaintiff Aceves Gurrola notified Alvarez that he needed to find a better paying job to support his family. He promised to pay off the $10,000 loan Alvarez provided him and noted that he could do so faster at a better paying job.

74. As Plaintiff Aceves Gurrola was talking, Defendant Alvarez picked up and was handling his gun, removing and reinserting the clip so that Aceves Gurrola saw the bullets inside. As Aceves Gurrola continued to explain his decision, Alvarez forcefully pushed the clip back into the pistol one last time making a loud "click."

75. Still holding the gun, Alvarez glared at Aceves Gurrola and said "You're not leaving until you pay me!"  He then slammed the gun down on the table.

76. Alvarez gestured toward the Homeland Security office situated near the warehouse and told Aceves Gurrola that if he stopped working, Alvarez would report Aceves Gurrola to immigration officials.

77. After Plaintiff Aceves Gurrola left the meeting, he went to his car. He felt hot and his whole body was shaking. The tremors in his hands made it difficult to insert and turn the key. Aceves Gurrola was terrified by what Alvarez had threatened. He felt trapped.

78. Alvarez began deducting $220 from Aceves Gurrola's pay, leaving him with only $180 per week (approximately $2 per hour) to support his family of six. Consequently, Aceves Gurrola had to continue taking groceries from the warehouse on credit.

79. Alverez tracked and watched Aceves Gurrola closely. Plaintiff Aceves Gurrola continuously saw Alvarez drive by outside of the warehouse watching him. Whenever Aceves Gurrola went to one of Defendants' restaurants, the staff told him that Alvarez reported he was coming.

80. In early 2014, Aceves Gurrola calculated he had paid off the $10,000 "loan" for immigration assistance that was never provided. He decided it was time to leave and hoped Alvarez would let him go.

81. Nevertheless, Aceves Gurrola was afraid that if he left his employment, Alvarez would physically harm him or his family or report them to immigration officials.

82. Because of this fear, Plaintiff Aceves Gurrola decided not to tell Alvarez his plan to quit and stopped going to work.

83. A few days later, Defendant Alvarez's wife came to his home. She told him "Daniel told me to get the fucking phone from you." Aceves Gurrola went to the kitchen and erased his family's contact information, his photos, and other information from the phone. Aceves Gurrola did not want Alvarez to have any of this personal information that could make it easier to locate Aceves Gurrola or his family. He then gave the phone to Alvarez's wife, who grabbed the phone and left.

84. Plaintiff Aceves Gurrola quickly moved his family to a different apartment so that Alvarez and his associates could not find them.

85. Plaintiff Aceves Gurrola began working at El Acapulco restaurant in Cape Girardeau, Missouri. But then he soon noticed Alvarez driving by the restaurant and staring threateningly at Aceves Gurrola.

86. Aceves Gurrola saved as much as he could at the restaurant, and after three months he was able to purchase bus tickets for him and his family to flee from Cape Girardeau and Alvarez's reach. Aceves Gurrola was afraid to return to Mexico where he knew Alvarez had a lot of power and connections with dangerous people.

87. The stress from his employment and debt to Alvarez caused Aceves Gurrola to have high blood pressure. Early on in his ordeal, he rushed to the emergency room due to a severe, sight-impairing headache. His doctor diagnosed him as having extremely high blood pressure, prescribed him Lisinopril, and advised Aceves Gurrola to reduce his stress and rest

more. This medication cost him $35.00 per month, but Aceves Gurrola could not afford it so he rationed the medication.

88. Aceves Gurrola has experienced significant difficulty sleeping, eating, and enjoying time with his family as a result of Alvarez's threats and coercive tactics. He has experienced episodes of chest tightness and difficulty breathing from enduring the stress of being trapped and controlled by Alvarez economically and through threat of harm to him and his fear for his family.

## CLAIMS FOR RELIEF

### COUNT I

**TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, TRAFFICKING WITH RESPECT TO PEONAGE, 18 U.S.C. §§ 1581, 1590, 1593A, 1595**

89. The above paragraphs are realleged and incorporated by reference as if fully set forth herein.

90. Plaintiff bring this civil claim pursuant to the civil remedies provision of the TVPRA, 18 U.S.C. § 1595.

91. In violation of 18 U.S.C. § 1590, Defendants knowingly recruited, harbored, provided, or obtained Plaintiff for labor or services including through a violation of 18 U.S.C. § 1581 by holding or returning Plaintiff to a condition of peonage.

92. Defendants held Plaintiff in a condition of involuntary servitude.

93. Defendants did so by using force, physical violence, intimidation, legal coercion, threats of legal coercion or physical force, or other compulsion.

94. The holding was for a term continuing until Plaintiff repaid their purported "indebtedness" to Defendants.

95. Defendants acted knowingly and willfully with specific intent.

96. Defendants kept Plaintiff to satisfy a real or imagined debt.

97. Each and every Defendant knowingly received benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of the TVPRA, knowing or in reckless disregard of the fact that the venture has engaged in such violation

98. Pursuant to 18 U.S.C. § 1595, Plaintiffs are entitled to recover compensatory and punitive damages, attorneys' fees, and any other relief deemed appropriate for Defendants' wrongful conduct.

## COUNT II

### TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, FORCED LABOR, 18 U.S.C. §§ 1589, 1593A, 1595

99. The above paragraphs are realleged and incorporated by reference as if fully set forth herein.

100. Plaintiff brings this civil claim pursuant to the civil remedies provision of the TVPRA, 18 U.S.C. § 1595.

101. Defendants subjected Plaintiff to forced labor in violation of 18 U.S.C. § 1589. Defendants knowingly used serious harm or threats of serious harm to Plaintiff to obtain the labor and services of Plaintiffs in violation of 18 U.S.C. § 1589(a)(2).

102. Defendants knowingly abused or threatened to abuse the law or legal process to obtain the labor and services of Plaintiff in violation of 18 U.S.C. § 1589(a)(3).

103. Defendants knowingly used a scheme, plan, or pattern intended to cause Plaintiff to believe that, if he did not perform labor or services, that Plaintiff or members of his family would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

104. As a result of Defendants' conduct, Plaintiff has suffered injuries.

105. Each and every Defendant knowingly received benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of the TVPRA, knowing or in reckless disregard of the fact that the venture has engaged in such violation

106. Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover compensatory and punitive damages, attorneys' fees, and any other relief deemed appropriate for Defendants' wrongful conduct.

## REQUEST FOR RELIEF

Plaintiff respectfully requests that this Court enter an order granting judgment in favor of Plaintiff Aceves Gurrola and awarding damages, both actual and punitive, pursuant to the TVPRA; awarding Plaintiff his costs and attorney's fees; awarding Plaintiff pre-judgment and post-judgment interest; and granting such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims.

Respectfully Submitted,

/s/ Chris Dove
Chris Dove     EDMO #21251KS
DRZ LAW, LLC
8700 State Lane, Suite 305
Leawood, KS 66206
913-400-2033
chris@drzlawfirm.com

/s/ Merideth J. Hogan
Merideth J. Hogan    EDMO #69851MO
Legal Aid of Western Missouri
4001 Blue Parkway, Suite 300

Kansas City, MO 64130
816-474-6750
mhogan@lawmo.org

ATTORNEYS FOR PLAINTIFF